# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| CHARLOTTE MORARIU, derivatively on behalf of Nominal Defendant, NATERA, INC. <br><br> Plaintiff, <br><br> v. <br><br> STEVE CHAPMAN, MATTHEW RABINOWITZ, ROY BAYNES, ROELOF F. BOTHA, ROWAN CHAPMAN, JAMES I. HEALY, GAIL MARCUS, HERM ROSENMAN, JONATHAN SHEENA, MICHAEL BROPHY, PAUL BILLINGS, and RAMESH HARIHARAN, <br><br> Defendants, <br><br> and <br><br> NATERA, INC., <br><br> Nominal Defendant. | Case No. 1:23-CV-1251 <br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Charlotte Morariu ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Natera Inc. ("Natera" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants'[1] breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her

---

[1] The "Individual Defendants" are Steve Chapman ("S. Chapman"), Matthew Rabinowitz ("Rabinowitz"), Roy Baynes ("Baynes"), Roelof F. Botha ("Botha"), Rowan Chapman ("R. Chapman"), James I. Healy ("Healy"), Gail Marcus ("Marcus"), Herm Rosenman ("Rosenman"), Jonathan Sheena ("Sheena"), Michael Brophy ("Brophy"), Paul Billings ("Billings"), and Ramesh Hariharan ("Hariharan").

own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including litigation filings, conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Natera, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Natera against the Individual Defendants, certain current and former officers and members of the Board, for *inter alia* (1) breaching their fiduciary duties by intentionally or recklessly making and/or permitting the dissemination of materially false and/or misleading statements from at least February 26, 2020, through March 14, 2022; (2) violating federal securities laws by causing the issuance of materially false and misleading statements in the Company's annual proxy statements filed with the SEC on April 16, 2020 (the "2020 Proxy") and April 13, 2021 (the "2021 Proxy"); and (3) selling Company stock at artificially inflated rates while in possession of adverse, material, non-public Company information in violation of the law.

2.      Natera is a genetic testing company that develops, markets, and commercializes a range of genetic tests in the areas of women's health, organ health, and oncology.

3.      The Company's core products include Panorama, a non-invasive prenatal test ("NIPT"), and Prospera, a non-invasive kidney transplant rejection test.  As detailed herein, Panorama and Prospera were significant drivers of revenue for Natera at all relevant times.

4.      *First*, Defendants made materially false and misleading statements about Natera's

flagship NIPT, Panorama. Panorama screens blood drawn from pregnant women for aneuploidies (genetic abnormalities) and other relevant information, providing important information about a pregnancy, such as indications of Down syndrome. Before 2020, Natera added additional screening for "microdeletions," which tests for incredibly rare diseases and conditions. Notably, these costly tests were distinct from the part of the Natera test that checked for aneuploidies, were not uniformly covered by a patient's medical insurance, and coverage was often rejected.

5.      Defendants told investors that Panorama was driving Natera's impressive revenue performance. For example, in an August 5, 2020 press release, Natera, reported year over year revenue growth and proclaimed that the "increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests." Alongside these representations, Defendants assured the market that Natera's strong performance was underpinned in large part by growing demand for Panorama, which they represented could potentially generate hundreds of millions of dollars in future revenue.[2] These and similar statements created the misleading impression that Panorama-generated revenue was the result of organically growing demand. But, in fact, this revenue and purported demand were fueled by deceptive and improper business practices within Natera (the "Panorama Misconduct").

6.      Natera engaged a closely affiliated third-party entity known as My Genome My Life, Inc. ("MGML") to indiscriminately submit prior authorization requests typically necessary for health insurers to assess whether they would cover the expenses related to a medical procedure. Natera never disclosed the intimate connection between the company and MGML, which ran contrary to U.S. Office of the Inspector General ("OIG") guidance aiming to combat kickbacks

---

[2] During an earnings call on February 25, 2021, for instance, S. Chapman referenced Panorama's microdeletions test and stated, "last year, we did 400,000 microdeletion tests, and that was at a growth rate of 37% year-on-year versus 2019. So this is really a rocket ship that's growing."

and other unethical practices in the realm of medical billing. Indeed, from 2018 to March 2022, Natera reaped the benefits of approximately 450,000 prior authorization submissions orchestrated by MGML. These submissions, at times made without due consideration for the patients' underlying necessity and occasionally after the relevant tests had already been conducted, had several adverse consequences that artificially boosted Natera's revenue through a sheer increase in volume and inflated revenue growth because of cases where prior authorization was denied after a Panorama test had been administered. Further, in a significant departure from industry norms, Natera made microdeletion testing the default choice when ordering Panorama, meaning patients had to actively opt out of microdeletion screening when requesting NIPT. By automatically enrolling patients in this costly test for extremely rare conditions, Natera artificially inflated the number of microdeletion screenings ordered. This created the illusion of organic growth in demand for microdeletion testing. Moreover, since many insurance providers did not cover the costs of microdeletion screening, the large volume of microdeletion screenings allowed Natera to directly seek payment from patients for this supplementary test.

7.    *Second*, to gain the desired share in the kidney transplant rejection test market, Defendants repeatedly touted Prospera as clinically superior – *i.e.*, more accurate and sensitive – to CareDx, Inc.'s AlloSure test. AlloSure was the dominant product in the area and CareDx, Inc. was the Company's chief competitor in this market. Defendants based these claims of superiority *inter alia* on Natera's Prospera clinical study data (the "Sigdel Study") and a separate study of AlloSure (the "Bloom Study"). For instance, the Company's website, citing the Sigdel Study and the Bloom Study (sometimes collectively referred to as the "Studies"), represented that when "comparing published clinical validation studies, Prospera demonstrated better performance." Further, in September 2021, Defendant S. Chapman, Natera's Chief Executive Officer ("CEO")

told investors that Prospera "generated performance data that was better than what was on the market from competitors." These and other statements detailed herein were false and misleading, including because Natera never conducted a head-to-head empirical comparison of Prospera and AlloSure (the "Prospera Misconduct"). In March 2022, Natera's Senior Medical Director of the Organ Health Group, Dr. Phillippe Gauthier, admitted this in sworn trial testimony taken in *CareDx, Inc. v. Natera, Inc*., No. 19-cv-00662 (D. Del.) (the "CareDx Litigation"), a federal lawsuit in which CareDx accused Natera of making false and misleading statements concerning Prospera's superiority over AlloSure based on the Studies.

8.      The Studies on which Defendants based their claims had numerous, fundamental methodological differences that prevented a head-to-head comparison of Prospera's clinical performance versus that of AlloSure based on the Studies. Defendants knew this and indeed recognized internally since at least 2018 that these differences made their claims about Prospera's performance and superiority false and misleading. For example, in a November 2018 internal email, Defendant Hariharan, Natera's then-Vice President of Marketing & Medical Education, stated to several high-level employees: I "don't think we can claim superiority." In December 2018, Defendant Billings, Natera's then-Chief Medical Officer ("CMO") and Senior Vice President of Medical Affairs, acknowledged in an email about the Studies: "The reviewers are trying for apples to apples. Unfortunately, in these kinds of studies, that is not possible."

9.      Natera employees were trained to and did promote Prospera as clinically superior to AlloSure based on the Studies. In a tacit and undisclosed acknowledgment of the misleading nature of these messages—which mirrored Defendants' public statements—in or around June or July 2020, these employees were abruptly instructed to cease making such comparisons to consumers.

10.     From at least February 26, 2020 to March 14, 2022, the Individual Defendants engaged in both the Prospera Misconduct and the Panorama Misconduct and intentionally or recklessly made and/or permitted the dissemination of materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.

11.     The false and misleading statements described herein caused Natera's stock price to more than triple across 2020 and well into 2021—from a closing price of $34.77 per share on February 26, 2020, to over $129 per share in September 2021.

12.     In July 2021, with Natera's common stock price trading near its all-time high, the Company sold investors 5.175 million shares of its common stock at $113 per share in a secondary public offering (the "July 2021 SPO"). The July 2021 SPO was authorized by Defendants S. Chapman, Brophy (Natera's Chief Financial Officer ("CFO")), Rabinowitz (Natera's founder and Executive Chairman), and the rest of the Company's Directors, and generated roughly $585 million in gross proceeds. This SPO came just 10 months after another public offering by Natera in September 2020 that yielded gross proceeds of roughly $287 million. In total, Natera sold more than $870 million worth of common stock at artificially inflated prices in less than a year.

13.     Further, while in possession of material non-public information, Defendants S. Chapman, Brophy, and Rabinowitz collectively sold over $137 million worth of Natera common stock through insider sales from February 26, 2020 to March 14, 2022 in violation of the law.

14.     On March 9, 2022, investment research firm Hindenburg Research issued an explosive investigative report (the "Hindenburg Report") revealing that Natera engaged in deceptive sales and billing practices to drive up Panorama revenue. The report detailed Natera's use of MGML to submit prior authorizations, and how Natera was propping up microdeletion

demand by forcing patients to opt out of receiving such screenings. Natera's common stock price cratered in direct response, falling 33% upon the disclosure.

15.    Days later, on March 14, 2022, a federal jury found that Natera intentionally and willfully misled the public by falsely marketing Prospera as more accurate than, and superior to, AlloSure. The jury awarded CareDx $44.9 million in monetary damages, including $23.7 million in punitive damages. Transcripts of sworn testimony and prior-sealed documentary evidence from that trial, none of which was public prior to March 2022, included discussion of internal Natera emails and records showing that Defendants knew or were severely reckless to disregard the possibility that their claims about Prospera's supposed superior performance were materially inaccurate and misleading. On this news, Natera common stock fell again, by approximately 22%. By the end of March 2022, Natera's stock had fallen more than 70% from its September 2021 high of $129.09.

16.    On February 17, 2022, as a further result of the foregoing, a securities class action was filed against the Company and Defendants S. Chapman, Rabinowitz, Brophy, Billings, and Hariharan (the "Securities Action Defendants") captioned *Schneider v. Natera, Inc., et al.*, 1:22-cv-00398-DAE (W.D. Tex.) (the "Securities Class Action"). On September 11, 2023, the court in the Securities Class Action denied the Securities Action Defendants' motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Securities Class Action has exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17

C.F.R.§240.14a-9) promulgated thereunder by the SEC.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

21.    Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Natera is incorporated within this District.

## PARTIES

*Plaintiff*

22.    Plaintiff is, and has been at all relevant times, a shareholder of Natera.

*Nominal Defendant*

23.    Nominal Defendant Natera is incorporated under the laws of the State of Delaware, with its principal executive offices located at 13011 McCallen Pass, Building A Suite 100, Austin, Texas 78753.  Natera is a diagnostics company that specializes in cell-free DNA ("cfDNA") testing dedicated to oncology, women's health, and organ health. Natera was founded in California in 2003 as Gene Security Network, LLC.  In 2007, the Company changed its name to Natera, Inc. The Company operates one business segment—the development and commercialization of molecular testing services—and has three primary business lines: Women's Health; Organ Health; and Oncology. Natera's common stock has traded on the NASDAQ under the ticker symbol "NTRA" since the Company went public in July 2015.

*The Individual Defendants*

24.     Matthew Rabinowitz is a co-founder of Natera and serves as Chairman of the Board.  Rabinowitz served as Natera's CEO from 2005 through 2018, when S. Chapman was appointed CEO, effective January 8, 2019. In connection with the announcement of Rabinowitz transitioning to Executive Chairman, Natera stated, "Rabinowitz will remain integrally involved as Executive Chairman focusing on the company's long-term business strategy and technology innovation."

25.     Steve Chapman is the Company's CEO and also serves as a member of the Board. S. Chapman joined Natera in 2010 as Vice President of Sales, later becoming Chief Commercial Officer and then Chief Operating Officer.  As COO, S. Chapman led the Company's commercial entry into the NIPT market. S. Chapman was appointed CEO in January 2019, and, according to Natera, "has been instrumental" in extending Natera's "core technology [and] achieving rapid commercial growth for the Prospera™ transplant assessment test."

26.     Roy Baynes has served as a member of the Board since July 2018.  Baynes is Chief Medical Officer at Merck, and Senior Vice President and Head of Global Clinical Development at Merck Research Laboratories. Baynes was previously Senior Vice President of Oncology, Inflammation, and Respiratory Therapeutics at Gilead Sciences, and also served as Vice President of Global Clinical Development and Therapeutic Area Head for Hematology/Oncology at Amgen.

27.     Roelof F. Botha has served as a member of the Board since 2007. Botha has been with Sequoia Capital, a venture capital firm, since 2003, and has been a Managing Member of Sequoia Capital Operations, LLC since 2007.

28.     Rowan Chapman has served as a member of the Board since August 2019. R. Chapman has held senior roles as Head of Johnson & Johnson Innovation, Western North America,

Australia and New Zealand, and as Head of Precision Diagnostics at GE Healthcare Life Sciences, Managing Director of New Business Creation, and Head of Healthcare Investing at GE Ventures.

29.    James I. Healy has served as a member of the Board since November 2014.  Healy has been a General Partner at Sofinnova Ventures, a venture capital firm, since 2000.

30.    Gail Marcus has served as a member of the Board since March 2017. Marcus was a healthcare executive across a diverse portfolio of healthcare organizations in the US and UK, including Cigna, UnitedHealthcare Group Inc., CVS/Caremark, and Caris Diagnostics of Caris Life Sciences.

31.    Herm Rosenman has served as a member of the Board since February 2017 and served as the Company's Chief Financial Officer from February 2014 to January 2017.

32.    Jonathan Sheena is a co-founder of Natera and has served as a member of the Board since 2007.

33.    Brophy has served as Natera's CFO since February 1, 2017 and previously served as Senior Vice President of Finance and Investor Relations starting in September 2016.  Prior to that, Brophy served as the Company's Vice President of Corporate Development and Investor Relations.

34.    Billings served as Natera's CMO and Senior Vice President of Medical Affairs from April 2018 until his resignation in December 2021.

***Non-Parties***

35.    Non-party Ruth E. Williams-Brinkley has served as a member of the Board since 2023.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.    By reason of their positions as officers and/or directors of Natera, and because of their ability to control the business and corporate affairs of Natera, the Individual Defendants owed Natera and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Natera in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Natera and its shareholders.

37.    Each director and officer of the Company owes to Natera and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Natera, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.    To discharge their duties, the officers and directors of Natera were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Natera, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42.    To discharge their duties, the officers and directors of Natera were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Natera were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with applicable laws and regulations and the United States, and pursuant to Natera's own Code of Conduct;

(b)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Remain informed as to how Natera conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Natera and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Natera's operations would comply with all applicable laws and Natera's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Natera.

44.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Natera and were at all times acting within the course and scope of such agency.

13

45.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## NATERA'S CODE OF CONDUCT

46.     Natera's Code of Business Conduct and Ethics (the "Code of Conduct") applies to all of the Individual Defendants, noting "[i]t is the responsibility of each individual to adhere stringently to the Code."

47.     In a letter from the CEO at the beginning of the Code of Conduct, S. Chapman writes that the Code of Conduct "outlines the high ethical standards we set for ourselves and the policies we follow in accordance with our strong commitment to compliance." The letter continues:

> Our tests have touched the lives of millions of people. We recognize the privilege we have in providing critical information to individuals and their families at some of life's most important moments. We also understand that there is 'a person behind every sample'—a mother, a father, a teacher, a friend. They all rely on us to operate from a strong ethical foundation and ensure that integrity is the cornerstone of each interaction. Following the Code of Conduct is a daily commitment we make to our patients, healthcare partners, colleagues and shareholders. Doing so is paramount to earn and maintain their trust. It is our responsibility to live by these policies, and it's also the right thing to do.

48.     In a section titled Our Priorities, the Code of Conduct states, *inter alia:*

> Scientific Rigor. We invest significantly in scientific studies as part of our commitment to offer precise and highly accurate testing solutions with real-world value. Natera's tests are validated by numerous peer-reviewed publications that demonstrate high accuracy. Natera is a leader in peer-reviewed, published data across cfDNA applications. Our list of peer-reviewed publications can be found on our website.

> Transparency. We are transparent about how our products can and should be used by both health care providers and patients. Natera provides each patient with a personalized, clinically validated test report to know their unique molecular biology and enable more informed health care decisions in critical health moments. We do not provide medical advice.

> Accessibility. Natera collaborates with health care providers, payers, and

advocacy groups to increase access to clinical genetic testing, educational information, and personalized health care.

Credibility. We promote and market our products after rigorous, clinical validation, and only for clinically validated uses. Our materials are reviewed by internal stakeholders, including our Legal and Compliance Departments, for conformity with health care, legal, and regulatory requirements.

***

We provide information and counsel, not medical advice. We believe patient choice is an important part of the health care process and health care should be a partnership between patient and provider. We offer materials to help inform patients when speaking with their clinicians and making health care decisions. While Natera provides services that include genetic counselor resources, anyone seeking a genetic or cfDNA test should consult their health care provider. We educate and don't prescribe. We believe educational materials are important and helpful to those seeking information on conditions, diseases, and genetic testing. We provide these materials as an adjunct for patients seeking medical care and guidance from health care providers. Natera does not prescribe tests for patients. All testing options, even when initiated by patients, must be ordered by a licensed physician or other authorized health care professional.

49.     In a section titled Honesty and Integrity, the Code of Conduct states, *inter alia:*

We are committed to providing outstanding service and conducting our business honestly and with integrity. we keep our commitments to each other, to our customers, and to our partners. we endeavor to communicate in an honest and unambiguous way, and to avoid making any misstatements of fact, making misleading or exaggerated communications, or creating false impressions. We are open and transparent, committed to complying with governing laws, rules and regulations. Natera will not misinform, misrepresent, or otherwise make unsubstantiated claims about the products or services provided. We are committed to preventing unethical or unlawful behavior, to halt any such behavior as soon as it is identified and to implement corrective action.

50.     In a section titled Insider Trading, the Code of Conduct states, *inter alia:*

We conduct our business in a truthful, open manner. Federal law and Natera's insider trading policy prohibit both trading on the basis of material nonpublic information and "tipping" others by providing material nonpublic information to them and may result in criminal prosecution. Material nonpublic information is information that has not been released to the public and which a reasonable investor would find useful in determining whether to buy or sell stock, e.g., financial results, sales results, acquisitions, customer

wins or losses, or changes in senior management. We do not buy or sell stock on the basis of material nonpublic information, or pass such information to any others, including friends or family.

51.     In a section titled Conflicts of Interest, the Code of Conduct states, *inter alia:*

Employees should devote their full energies to their work. If an employee engages in other business activities during non-working hours, they should be sure that those activities do not interfere with their work at the company. Employees are not to engage in any outside activities or interests, economic or otherwise, that are contrary to the best interests of the company, or that adversely affect their or another employee's job performance. This may preclude working in any capacity for another person or entity offering goods or services that are, or may be, competitive with those offered by the company. It also precludes working with or accepting gifts from the company's subcontractors, vendors, or customers. If there is any question as to whether an activity constitutes a conflict of interest, prior written approval to engage in that activity must be obtained from human resources. Similarly, human resources must approve any outside employment in advance, and in writing. please contact human resources if you have any questions regarding this policy.

### ADDITIONAL DUTIES OF THE AUDIT COMMITTEE

52.     Natera's Audit Committee Charter provides that the committee is vested with oversight of *inter alia* "the integrity of the Company's financial statements," and "compliance with legal and regulatory requirements."

53.     The Audit Committee Charter states that the committee shall review and discuss the following with management, the internal auditors, and the independent auditor, as applicable:

- The annual audit plan and scope of audit activities and monitor such plan's progress.

- The scope and timing of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the

16

Company's financial statements, and the independent auditor's opinion on the audited financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

- Any significant disagreements between management and the independent auditor.

54.    The Audit Committee Charter states further that the committee shall "review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases and the type and presentation of information to be included therein (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts, and rating agencies."

55.    The Audit Committee Charter states further that the committee shall "review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any

material control deficiencies, and any fraud, whether or not material, that involves management or other company employees who have a significant role in the company's internal controls."

56.     The Audit Committee Charter states further that the committee shall "review and discuss the adequacy and effectiveness of the company's disclosure controls and procedures."

57.     The Audit Committee Charter states further that the committee shall "review, with counsel, legal or regulatory matters that could have a material impact on the Company's financial statements."

58.     The Audit Committee Charter states further that the committee shall "oversee the management of risks associated with the company's financial reporting, accounting, auditing and information security (including cybersecurity) matters, including the company's guidelines and policies with respect to risk assessment and risk management."

## SUBSTANTIVE ALLEGATIONS

### *The Panorama Misconduct*

59.     By the end of 2017, Natera claimed to have taken over as the NIPT market leader by volume in the United States. In November 2021, S. Chapman told analysts that Natera's share of the NIPT market was close to 40%, and that "[w]e track our market share, and we can see the competitive market shares as well through these detailed market surveys that we do. And we've been gaining share relative to the rest of the market."

60.     Natera's flagship NIPT, Panorama, is used to test for fetal chromosomal abnormalities. Using a blood sample from a pregnant woman, Panorama analyzes DNA from the placenta for certain chromosome conditions that could impact a baby's health in a process that can be performed as early as nine weeks into a pregnancy. At all relevant times, Panorama screened for several aneuploidies (disorders that are caused by the presence of an extra or missing copy of

a chromosome), including Down syndrome. Through an additional screen at significant additional cost, Panorama could also test for five very rare microdeletion syndromes, one of which was DiGeorge syndrome. Microdeletions are small, missing parts of a chromosome. Natera billed for aneuploidy and microdeletion screening separately. Thus, where a patient's Panorama test included both aneuploidy and microdeletion screening, Natera would bill separate costs for each type of screening, generating revenues from both.

61.    At all relevant times, Defendants told investors that Natera's positive revenue performance was driven, in large part, by Panorama. Indeed, according to Natera, in 2019, 2020, and 2021, Panorama was one of two tests that "represent[ed] the significant majority" of Natera's revenues. During this same time, Defendants drew the market's attention to what they suggested was organically growing demand for Panorama, including for microdeletion testing. In truth, however, these statements were materially false or misleading because Panorama revenue and the demand for the test were propped up to significant degree by deceptive business practices, discussed below.

62.    In a February 26, 2020 press release reporting results for 4Q19[3] and the fiscal year ended December 31, 2019, Natera disclosed "[t]otal revenues were $83.2 million in the fourth quarter of 2019 compared to $67.0 million for the fourth quarter of 2018, an increase of 24%." Defendants asserted: "The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests."  The Company repeated these statements on at least May 7, 2020 and August 5, 2020.

63.    Defendants also touted the purported organic growth in the volume of Panorama tests performed, which they attributed in significant part to supposed increasing demand for its

---

[3] All references to "_Q__" refer to the quarter of the filing followed by the year of the filing.

microdeletion screen. For example, during Natera's 4Q20 earnings call, S. Chapman stated, "last year, we did 400,000 microdeletion tests, and that was at a growth rate of 37% year-on-year versus 2019. So this is really a rocket ship that's growing. We're running the tests. If we can get reimbursement, it's going to be—we're going to be off to the races."

64.    Similarly, during the JPMorgan Healthcare Conference on January 12, 2021, S. Chapman again emphasized Natera's purported microdeletion demand, stating, in relevant part, that approximately 80% of all Panorama tests that doctors ordered now included orders for microdeletion screens:

> If you're conservative and you just say $250 a test, that puts you at $100 million in additional revenue and cash just from the book that we're running today. Now you shouldn't think about it as being capped at that level because we see doctors ordering the microdeletion test 8 out of 10 times, they place an order for Panorama. So as we penetrate that additional 3 million tests in the average risk space, that microdeletion number is going to go up significantly as well. And it's pretty baked into our COGS as well.

65.    During Natera's 4Q20 earnings call on February 25, 2021, S. Chapman gave prepared remarks, in which he stated:

> The next slide demonstrates that revenue growth is tracking nicely with volume growth, once again, accelerating meaningfully over what we've seen in the past. If you just zero in on product revenues on the right-hand side, you'll see revenue growth rates of 43%. This removes development revenue from partners, which was larger in 2019 than it is now. We saw recurring ASPs step up again in Q4 versus prior periods, and blended COGS remain in the low 200 range. The combination of consistent gross profit per test and volume growth that we talked about in the past is working as expected, allowing us to get the women's health business to cash flow breakeven, supporting even bigger investments in the oncology business.

66.    During the Company's May 6, 2021 1Q21 earnings call, S. Chapman gave prepared remarks, stating, "[a]s our base of business has grown substantially, our growth rates have still continued to accelerate. That acceleration is being driven by continued strong growth in the women's health business, but also we are seeing some real benefit from oncology and organ health

as well."

67.    On August 5, 2021, Natera held its earnings call to discuss the Company's financial results for 2Q21. During his prepared remarks, S. Chapman stated, "[t]otal revenues and product revenues were both up 64% and approximately 71% respectively, over the same period last year. Net acceleration is being driven by continued strong growth in the Women's Health business and big contributions from oncology and transplant." Chapman also stated, "[w]e were also very exciting [sic] to see the Women's Health business to go cash flow breakeven in the quarter. This was one of the top goals, I announced when I took over as CEO in 2019, and I'm proud that our team achieved this while simultaneously hitting record growth rates."

68.    During Canaccord Genuity's 41st Annual Growth Conference on August 11, 2021, Brophy again made statements about Panorama's purported microdeletion demand—*i.e.*, how frequently microdeletion screens were ordered when a Panorama test was ordered—and expressed further confidence in attaining further growth. Specifically, Brophy stated "we also get a microdeletion test ordered very frequently along with the NIPT. So for every JOO NIPTs there's... something like 75 microdeletion tests that get ordered. So we're very well positioned to take this one kind of macro trend and see it really amplified in our business."

69.    On September 10, 2021, Natera participated in the Wells Fargo Virtual Healthcare Conference. Wells Fargo analyst Daniel Leonard asked Brophy to "remind me what you're telling folks on microdeletions." In response, Brophy stated, in part, "Yes. I mean microdeletions continues to be a very popular product for us ... roughly speaking, I mean, for every 100 NIPTs to [sic] get ordered, we get about 80 or so microdeletions orders."

70.    On September 13, 2021, during a virtual conference for Morgan Stanley Global Healthcare, Brophy made a similar statement, claiming, "as NIPTs penetrate, we have a couple of

different ways to magnify the impact of that penetration in our business. One is for every 100 NIPTs that get run, something like 40 to 43 carrier screen tests get run. The other is that for every 100 NIPTs that get run, something like 80 microdeletions test gets run. So 1 trend 3 different products that can really drive a lot of outsized performance for us."

71.    During Natera's 3Q2l earnings call on November 4, 2021, S. Chapman gave prepared remarks, stating:

> Total revenues and product revenues were both up 61% and 62%, respectively, over the same period last year. That acceleration is being driven by continued strong growth in the women's health products and big contributions from oncology and transplant products.

72.    Defendants' above statements were materially false and misleading and omitted material facts when made because they gave the market the impression that Natera's impressive Panorama revenues were the result of organic and growing demand, when in fact they were propped up by Natera's deceptive practices, including using the Company's prior authorization scheme with MGML and opting patients into microdeletion testing, both in contravention of established industry guidance. None of the material facts relating to these practices were disclosed to investors.

73.    Indeed, while Defendants were highlighting Panorama's impressive revenue performance and microdeletion demand, Natera was engaged in deceptive practices that inflated both metrics.

74.    In contravention of well-established anti-kickback guidelines for medical billing industry participants, Natera was using a third-party company with which it maintained undisclosed intimate ties to provide free prior authorization services to practitioners and submit prior authorization requests for the Company's Panorama tests. That third-party submitted those requests without regard for the medical necessity on the underlying procedure and, thus, whether

insurers would ultimately approve such requests. This directly enabled Natera to sell more tests and generate increased revenue.

75.    Deepti Gupta was the driving force behind and architect of MGML. At the time MGML was founded, and throughout the Class Period, Gupta maintained significant connections with Amar Karnath. Karnath held the position of Natera VP of Commercial Sales from October 2017 until May 2019, when he left the Company.[4]

76.    One person familiar with MGML's operations recounted to Hindenburg that, following the uptick in commercial payers increasingly mandating prior authorizations, Karnath "realized that his sales operation was up against the wall," which coincided with MGML's creation and Karnath starting his role as Natera's VP of Commercial Sales in October 2017.

77.    Just months later, in early 2018, Natera began using MGML to submit significant volumes of prior authorizations for Panorama testing. Defendants admitted this fact during a special investor call on March 10, 2022, that the Company held to address the March 9, 2022 Hindenburg Report. Specifically, Defendants admitted the arrangement, and revealed for the first time the extent to which Natera used MGML to fuel its Panorama revenues. Between 2018 and March 10, 2022, Defendants confirmed that Natera routed roughly 450,000 Women's Health (including Panorama) prior authorizations through MGML. The approximately 450,000 prior authorizations through MGML amounted to roughly 25% of all prior authorizations that MGML

---

[4] A May 2018 general warranty deed shows that Karnath and Gupta purchased a condominium in Travis County, Texas together. That same general warranty deed listed Karnath and Gupta as the grantees for the condominium, and listed a single "Grantee's Address" in Sparta, New Jersey for Gupta and Karnath. Additional property records obtained through Plaintiffs' investigation show that Gupta and Karnath continued to purchase properties together in both New Jersey and Texas in 2020 and 2021. Prior to these joint purchases, as detailed in the Hindenburg Report, Gupta and Karnath traveled together on a personal overseas trip in 2016, a fact reflected in photographs that were posted on Facebook.

completed since its founding. Natera also disclosed that in 2021 alone, 11% of its Women's Health prior authorizations were conducted by MGML. This totaled roughly 159,000 tests just in 2021.

78.     At all relevant times, the vast majority of all Natera Women's Health tests processed were Panorama. Although Natera stopped disclosing the number of total Panorama and Women's Health tests run starting with its 4Q19 financial results, for fiscal year 2018, Panorama accounted for 71.2% of the 603,400 Women's Health tests processed. And in 1Q19 through 3Q19, Panorama amounted to 70% of the 537,400 Women's Health tests processed over those nine months.

79.     Canaccord Genuity issued a report on March 10, 2022, stating that management confirmed roughly 70% of the prior authorizations MGML submitted for Natera were approved.

80.     In September 2010, the U.S. Department of Health and Human Services Office of Inspector General ("OIG") issued an opinion regarding free prior authorization services. That OIG opinion noted the need for companies to be transparent when third-party firms are used to provide free prior authorization services. The OIG reiterated this position in no fewer than three opinions issued on May 6, 2010, August 31, 2010, and August 30, 2012. These opinions state, for example, that third-party prior authorization companies should disclose their identity to insurers when the prior authorization request is submitted in order to avoid arrangements that potentially violate anti-kickback rules. This is because when a party in a position to benefit from referrals (Natera) provides free administrative services (MGML providing free prior authorizations for Panorama tests) to an existing or potential referral source (doctors ordering Panorama tests), there is a risk that at least one purpose of providing the services is to influence referrals (by relieving doctors of the burdens of prior authorization at no cost to them, doctors would order more Panorama tests than they would otherwise, leading to more revenue for Natera).

81.    On March 9, 2022, Hindenburg published the Hindenburg Report, claiming "Natera's revenue growth has been fueled by deceptive sales and billing practices aimed at doctors, insurance companies and expectant mothers." The Hindenburg Report stated it was based on "more than 2 dozen interviews with former Natera employees, patients and industry experts, a review of hundreds of online complaints, FOIA requests to state Medicaid offices and state Attorneys General, and the company's financial filings." In particular, the Hindenburg Report stated that Natera began using MGML in 2018 and submitted large volumes of prior authorization requests for Natera's Panorama tests without regard to whether the prior authorizations would be approved or denied. In addition, the Hindenburg Report detailed that Natera opted patients into microdeletion screening with every Panorama test unless a physician specifically opted out of that screening, giving the impression that demand for those screens was organic, rather than the result of improper sales practices.

82.    When Hindenburg published its report detailing, among other things, Natera's undisclosed relationship with MGML, Defendants responded the next day, March 10, 2022, with a special investor call, in an effort to stem investor outcry. Tellingly, Defendants did not deny the underlying relationship between Natera's former executive and MGML. Instead, Chapman only weakly claimed his own limited knowledge of Natera's ignorance one way or the other about the underlying relationship, stating:

> The [Hindenburg] report makes an allegation that one of our former employees who left in 2019 had a personal relationship with a senior member of MGML. To my knowledge, we do not know whether or not that is true, and regardless, we had no knowledge of any personal relationships between MGML and an employee of Natera at the time we selected MGML as our outside vendor.

83.    In response to the Hindenburg Report, the price of Natera common stock fell as much as $28.65 per share, or more than 52%, from a close of $54.75 per share on March 8, 2022,

to an intra-day low of $26.10 per share on March 9, 2022. The stock price closed down approximately 33% for the day.

84.    Panorama's requisition (*i.e.*, order) form by default caused patients to order microdeletion screening for one microdeletion (DiGeorge syndrome).  Thus, all patients ordering Panorama screens would also receive this costly add-on test for extremely rare conditions, unless their physician opted them out of receiving such screens.  Defaulting patients into ordering microdeletion screening went against industry guidance issued in 2014 by the professional society The Society for Maternal Fetal Screening ("SMFM"). Moreover, Defendants knew, or were severely reckless to disregard, that most health insurers and other payers would either refuse to pay anything, or pay very little, for Panorama's microdeletion screening.

85.    By causing patients to order microdeletion screening by default, in contravention of well-recognized industry guidance and norms, Natera inflated the number of patients receiving microdeletion screening as part of their Panorama test and, in turn, the revenue that Natera derived from Panorama. This improper practice created the impression of organic demand for microdeletion screening, when the extraordinary order rate for microdeletions was really the product of Defendants' automatic opt-in tactic. Moreover, given the limited health insurance reimbursement for microdeletions within the industry, Natera's large number of microdeletion screens appeared to investors as an organic source of significant untapped revenues. And, because most health insurers did not cover microdeletions, Natera's deceptive business practice enabled the Company to pursue payment from patients for the cost of microdeletion testing that their health insurance did not cover, padding Natera's revenue from additional tests.

### *History of Improper Or Fraudulent Billing Practices*

86.     Natera's prior, related conduct also supports the conclusion that Defendants acted in bad faith.

87.     Natera historically abused CPT (*i.e.,* billing) codes to bilk federal and state health insurance programs out of money for Panorama tests. On March 8, 2018, the U.S. Department of Justice ("DOJ") announced that Natera agreed to pay roughly $11.4 million to resolve allegations that between January 1, 2013, through December 31, 2016, Natera knowingly submitted false or fraudulent claims seeking payment from federal and state health care programs for Natera's genetic testing services, including Panorama (including optional microdeletion panels) (the "DOJ Lawsuit").

88.     Specifically, the settlement resolved allegations including that, from 2013 to 2016, Natera knowingly submitted false or otherwise fraudulent claims relating to Panorama seeking payment from government healthcare programs, including TRICARE and Medicaid, by billing for the microdeletion screening that the government program did not cover. The settlement also resolved claims that Natera improperly billed TRICARE, the FEHB, and Medicaid by using an improper CPT code for Panorama that misrepresented Natera's services (which allowed Natera to be reimbursed at a higher rate (or at all) than it would have if it used the correct CPT code), and by submitting claims for patients with low-risk pregnancies.

89.     In the settlement, Natera denied those allegations, indicating that the Company had investigated the DOJ Lawsuit allegations and, thus, Natera's billing practices. At the time, S. Chapman was Natera's VP of Sales and VP of Commercial Operations and Rabinowitz was Natera's CEO. Accordingly, it is implausible that S. Chapman and Rabinowitz among others were not aware of Natera's prior Panorama billing practices.

*The Panorama Consumer Class Action*

90.    As detailed herein, Natera markets and sells NIPT tests for pregnant women that screen for various chromosomal and genetic conditions affecting a baby's health.   Natera markets its NIPT tests as the most reliable non-invasive method of screening for genetic conditions. Natera advertises its NIPT test, "Panorama," as "the most reliable way of non- invasively assessing a baby's health" and claims that Panorama is "overall the most accurate NIPT commercially available in the United States."

91.    In January 2022, a New York Times investigation reported widespread misrepresentations on the accuracy of NIPT.  The Times' analysis found that positive results from tests screening for rare chromosomal microdeletion disorders such as DiGeorge and Prader-Willi syndromes were incorrect approximately 85% of the time.  The Times also reported that companies offering NIPT were not transparent about the true accuracy of their tests.  "The Times reviewed 17 patient and doctor brochures from eight of the testing companies, including Natera, Labcorp, Quest and smaller competitors.  Ten of the brochures never mention that a false positive can happen.  Only one mentioned how often each test gets positive results wrong."

92.    A false positive on a prenatal test can have severe consequences for expecting parents. Besides unnecessarily enduring anxiety, stress, and anguish about the health of their child, pregnant women are subjected to invasive and expensive further diagnostic testing and the additional expense of genetic counseling and consulting with doctors specializing in high-risk pregnancies.

93.    Also in January 2022, the Campaign for Accountability sent a letter to the SEC detailing the misleading nature of NIPT marketing and asked the SEC to "investigate whether Natera, Inc. has misled investors in violation of the Securities Act of 1934."   The letter outlines

the misleading nature of Natera's NIPT results, and encourages the SEC to investigate the "company's effort to persuade pregnant women and their doctors of the efficacy of NIPTs" to determine "whether Natera knowingly overstated the accuracy of its NIPT."

94.    As a result, a class of consumers filed the class action captioned *Davis v. Natera, Inc.*, Case No. 3:22-cv-00985-AGT (N.D. Cal.) (the "Consumer Class Action"). The Consumer Class Action alleges *inter alia*, that:

> Natera has known for years that its NIPT tests are susceptible to false positives, yet it promotes its NIPT test as a reliable detector of rare abnormalities.  It also claims that its NIPT test produces fewer false positives than competing tests without revealing the extent to which pregnant women and their doctors may be induced to make health decisions based on inaccurate test results.

> Natera processes more than 400,000 NIPT tests each year, meaning that it tests about one in ten pregnant women in the United States.  Each patient is led to believe that they will receive accurate results.  Users of Natera's NIPT test, however, have not received what they paid for given the numerous problems that have come to light and many—including Plaintiff—have been subjected to unnecessary stress and anxiety, and additional medical costs due to a false positive indications of rare disorders.

> ***

> Natera specifically highlights the high "positive predictive value" or PPV of Panorama for Down syndrome.  Yet it never discloses the fact that the PPV for the rarer genetic conditions Panorama screens for is as low as 2-5%.

> ***

> Natera marketed and sold Panorama NIPT tests that it knew to be unreliable and failed to take sufficient steps to ensure the reliability of such tests.  Yet it encouraged consumers and doctors to rely on such tests to make vital decisions about their pregnancy and pregnancy related treatments.  Defendant knew that Plaintiff, consumers, and their treating physicians would reasonably expect the NIPT tests to be reliable, given the nature and importance of prenatal testing.

> Natera, however, made misleading partial representations and did not fully and truthfully disclose to its customers and their physicians that its NIPT tests cannot accurately and reliably detect rare disorders such as DiGeorge syndrome.  Such information was not readily discoverable by Plaintiff,

consumers, or their doctors. A reasonable consumer and physician would not expect that NIPT tests—which Defendant repeatedly claimed and heavily promoted to be highly accurate—would in fact frequently result in false positives.

At all relevant times, Defendant had a duty to disclose all facts material to Plaintiff and Class members' regarding the use and reliance upon NIPT test results because it had superior knowledge and access to relevant information regarding its own testing, made misleading partial representations regarding the accuracy and reliability of NIPT testing, and because it was in a special relationship with Plaintiff and Class members. Natera, however, failed to disclose all material information regarding its NIPT test to Plaintiff and the Class, as well as to their treating physicians, and concealed such material information with the intent that Plaintiff, Class members, and their physicians would rely on such misleading and incomplete information.

Consumer Class Action, ECF No. 1 at ¶¶ 4, 5, 28, 72-74. The Consumer Class Action that resulted from Defendants' misconduct has subjected the Company to massive class wide liability.

### *The Prospera Misconduct*

95.     On June 21, 2018, Natera announced that it had developed a new kidney rejection test, which would later be named Prospera. At the time, the established product in the market was CareDx's AlloSure, which had commercially launched in 2017.

96.     The performance of kidney transplant rejection tests like Prospera is measured by metrics including specificity, sensitivity, and overall accuracy using area under the curve ("AUC") analysis. In announcing the product in June 2018, Natera claimed its test was almost twice as sensitive as other available tests in detecting acute rejection of a transplanted kidney: "[t]his sensitivity compares favorably against competition, which reported only 59% sensitivity in a 2017 study." Defendant Billings, Natera's then-CMO and Senior Vice President of Medical Affairs, further stated "I look forward to working with the medical community to introduce this rapidly into clinical practice."

97.     On November 8, 2018, Natera held its 3Q18 earnings call, in which Chapman stated:

I'll highlight, again, the performance of our test in our robust clinical validation study completed in partnership with UCSF. This trial was nearly 2x the size of a clinical validation study published by Bloom et al., and also showed an improved area under the curve. Area under the curve is a metric that combines sensitivity and specificity and represents a fundamental power of a test. Natera uses specific molecular techniques that distinguish it from those used in Bloom et al, and we believe provide us with the competitive performance advantage.

98.     On January 7, 2019, in a press release titled, "Natera Announces Publication of Kidney Transplant Validation Study, Demonstrating Superior Data in Detection of Clinical and Subclinical Rejection," Natera represented the following about Prospera:

Clinical validation study results published in the Journal of Clinical Medicine, demonstrating the highly accurate performance of its [dd-ctDNA] test for active allograft rejection in kidney transplant recipients, including higher sensitivity and nearly 18% higher area under the curve (AUC) than the competitive dd-cfDNA assay. The study also reports the first accurate detection of T-cell mediated rejection (TCMR) and subclinical rejection. This marks the successful completion of all 2018 commercialization milestones, and is in line with the company's plan to secure Medicare coverage and commercially launch its test in 2019.

99.     During the American Society of Transplantation CEOT Conference held on February 21-23, 2019, Natera represented that data for its kidney rejection test (soon to be named Prospera) demonstrated that it was superior to CareDx's test.  Specifically, the presentation to investors stated Natera's test had "stronger test performance demonstrated with unique clinical capabilities."

100.    In September 2019, Natera issued a physician brochure which introduced the Prospera name for its test. That brochure touted Prospera's purported advantages over AlloSure, specifically citing the Studies.

101.    On December 19, 2019, Natera issued a press release claiming clinical data established that Prospera performed more effectively than "the competing dd-cfDNA assay" -- citing Studies. Specifically, Defendants told investors that "[t]he Prospera test has been clinically

and analytically validated for performance regardless of donor relatedness, rejection type, and clinical presentation" and that "[i]n clinical validation, Natera reported higher sensitivity (89% vs. 59%) and higher area under the curve (0.87 vs. 0.74) than the competing dd-cfDNA assay."

102.    On February 26, 2020, Natera held its 4Q19 earnings call with investors. During the call, S. Chapman emphasized Natera's "goal [] to have a successful commercial launch in 2020," and hailed Prospera's performance versus AlloSure, as purportedly demonstrated by Natera's "clinical validation data" (a reference to the Sigdel Study):

> Our clinical validation data compared favorably against the first-generation test across many aspects of performance including the detection of T cell-mediated rejection, the ability to detect subclinical rejection where there are no other clinical signs and the overall area under the curve. Our study was approximately 2x larger than the competition and has now been evaluated by independent experts at Medicare who rated our strength of evidence more favorably than the first generation test. In our conversations, we find that transplant physicians are responding positively to these data.

103.    During the same earnings call, Defendants presented a slide (which it also attached to a February 26, 2020 8-K), highlighting Prospera's clinical "outperformance" versus the "Other Commercial Assay" (*i.e.,* AlloSure) based on comparisons of various data points from the Studies.

104.    In Natera's 2019 10-K for the year ended December 31, 2019, dated February 28, 2020, Defendants stated, "In transplant rejection, published studies of our test performance in both clinical and analytical validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the current commercially available test."

105.    On March 11, 2020, Natera participated in the Barclays Global Healthcare Conference. During the conference, Brophy presented a slide deck and stated:

> Just a comment on the data as it relates to the first test that's on the market here. We feel like we' re in a really good competitive position versus the competition here. So just as a reminder, our clinical validation data compared very favorably against [sic] the competition across many aspects of performance, including the detection of T cell-mediated rejection, the ability to detect subclinical rejection, where generally subclinical means there are no

other clinical signs. And the overall kind of area under the curve was the probability that your test result is accurate. Our study was about twice as large as the competition is now, has been evaluated by independent experts in Medicare, who rated our proof of evidence more favorably than the competition. So in the conversations we've had in the field, we find that the transplant physicians are responding very positively to that data.

106.    On May 4, 2020, Natera issued a press release quoting Defendant Billings, proclaiming Prospera's "ability to identify rejection with higher accuracy than first generation dd-cfDNA tests and current standards of care[.]"  The statement included two footnote references—one to the Sigdel Study and one to the Bloom Study. Billings stated further that, "[t]he strong interest in Prospera and the significant number of top centers ordering tests during the early access program reflects a desire for more accurate, non-invasive testing methods, which Prospera fulfills through its ability to identify rejection with higher accuracy than first generation dd-cjDNA tests and current standards of care[.]" As Billings stated in sworn testimony in the CareDx Trial, when Natera used the term "first generation dd-cfDNA tests" in the context of discussing Prospera, it was referring to AlloSure.  The statement included two footnote references-one to the Sigdel Study and one to the Bloom study.

107.    On May 6, 2020, Natera held its 1Q20 earnings call, during which Chapman once again touted Prospera, stating:

> We've said for a long time that our unique product offering, which has best-in-class sensitivity and negative predictive values, including the ability to identify the important T cell-mediated rejection would be seen as a welcomed alternative for the transplant community. That's exactly what we've seen. In very short order, we've now seen roughly 45% of the top 50 centers place orders and 37% of the top 100 centers by volume place orders. This is really incredible and shows the need for a test like ours in the market.

108.    During the Morgan Stanley 18th Annual Global Healthcare Conference on September 14, 2020, S. Chapman similarly stated, "what you see in our peer-reviewed publication, the [Sigdel] study, that was our off-the-shelf version. So we didn't even try on that version. We

just took the off-the-shelf assay, ran it, and it generated performance data that was better than what was on the market from the competitors."

109.    In Natera's 2020 10-K for the year ended December 31, 2020, dated February 25, 2021, Defendants stated that, "Published studies of the performance of our Prospera transplant rejection test in both clinical and analytical validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the competing test."

110.    Natera's website likewise contained marketing materials that repeated the core message of Defendants' statements: Prospera had superior performance versus AlloSure based on what Natera presented as a direct, head-to-head study comparison. For example, Natera's website compared Natera's data against that of the "Other Commercial Assay," *i.e.,* AlloSure, citing to the Studies.

111.    Defendants' statements detailed above were materially false and misleading and omitted material facts when made because at no point did Natera conduct or possess a head-to-head study comparing Prospera and AlloSure, and the clinical data Defendants relied upon for the comparisons between Prospera and AlloSure did not support the comparisons Defendants drew. Internal Company emails and other communications from, *e.g.*, September 2018, November 2018, and February 2019, show widespread recognition by responsible Natera executives that the Company did not have a scientific basis to claim that the Prospera test was clinically superior to competing tests, and identify numerous technical differences between the Sigdel and Bloom studies on which Defendants based their claims of superiority. Underscoring these facts, Natera management steadfastly directed its Prospera sales staff to promote the test's supposed clinical superiority to AlloSure, but then abruptly instructed employees to stop making such claims. The unanimous federal jury verdict and findings that Natera made misleading statements asserting

Prospera's clinical superiority to AlloSure, and awarding damages, including punitive damages rendered following the presentation of evidence in the form of internal Company records and sworn testimony from Natera management and employees—is further evidence that Defendants' statements were materially false or misleading when made.

112.    Defendants knew or were severely reckless to disregard that their claims about Prospera's performance as compared to AlloSure, based on comparisons of the data from the Sigdel and Bloom studies, were unsupported. Natera's Senior Medical Director of the Organ Health Group, Dr. Gauthier, admitted in sworn testimony in the CareDx Trial that Natera did not have a "head-to-head" study versus AlloSure. This was because the Studies had fundamental differences that prevented a comparison of Prospera's performance versus that of AlloSure based on the tests, which included the following.

113.    To begin with, there were substantial disparities in the composition of the sample sets used in the Studies. Specifically, the Bloom Study was representative of the general kidney population as it invited all eligible patients to participate, whereas the Sigdel Study was not.  The Sigdel Study primarily drew from rejection samples accessible only at the University of California.

114.    Further, the Sigdel study intermingled "for cause" and "protocol" biopsy samples, a practice that the Bloom study refrained from. "For cause" kidney biopsies are administered to patients exhibiting warning signs of potential active rejection, whereas "protocol" biopsies are performed even in the absence of prior indications of rejection. The inclusion of "protocol" biopsies heightened the likelihood of obtaining negative test results, potentially inflating the rate or specificity, thereby artificially enhancing the accuracy data associated with Prospera.

115.    The Sigdel Study also did not adhere to the established Banff Classification of Allograft Pathology ("Banff Rules"), which provide standardized criteria for diagnosing various

types of kidney rejections. In this field, only studies conforming to the Banff Rules are generally accepted. In contrast to the Sigdel Study, the Bloom study diligently adhered to Banff Rules.

116. Finally, the fundamental methodologies employed in the Studies diverged significantly. For instance, the Sigdel study relied on data from a single site, whereas the Bloom study drew data from a multitude of sites. Additionally, the Sigdel study followed a retrospective approach, while the Bloom study adopted a prospective methodology.

117. Transcripts from sworn testimonies taken during the March 2022 CareDx Trial, as well as internal records from Natera referenced by those trial witnesses, reveal widespread acknowledgment among Natera's senior management and other professionals that the Prospera study data did not substantiate the public claims of Prospera's superiority made by the Defendants. Its noteworthy that this evidence, prior to its presentation in the CareDx Trial, remained under seal throughout the proceedings.

118. On September 11, 2018, Natera's Senior Director of Scientific Communications and Clinical Research, Zachary Demko emailed Defendant Billings, copying Dr. Felipe Acosta, Natera's Lead Data Scientist, about potential journals that could publish the Sigdel study, admitting that "the performance [of Prospera] isn't quite as high as we thought, and is not significantly better than CareDx's data." Securities Class Action, Amended Complaint (ECF No. 60) at ¶ 71.

119. On September 16, 2018, Demko emailed Defendant Billings, copying Dr. Acosta, about Prospera. In it, Demko acknowledged that "there is still a risk there with the PLoS Medicine [journal] as our numbers don't show significant difference with CareDx's calling into question the novelty of our manuscript." *Id.* at ¶ 72.

120. Also in September 2018, Elizabeth Mihok, Natera's then-Senior Program Manager

of R&D, held separate meetings with Dr. Allison Ryan, Natera's then-Vice President of R&D, Data Science and Billings to discuss Natera's claims regarding Prospera. Thereafter, Mihok memorialized the meetings in an email. Mihok stated: "After speaking with [Billings] and [Dr. Ryan], the following changes to transplant product performance claims were agreed upon." The communications then framed a new claim and an old claim. The old claim stated, "Test has significantly higher sensitivity and PPV than current commercialized tests." The new claim stated, "Natera's overall test performance is about equivalent to other commercialized assays." The email explained that the reason for the change was that "the statistical analysis does not support claims of significantly better performance." Mihok further acknowledged that "[i]t is misleading to claim higher sensitivity without also stating that it came with the price of lower specificity." In addition, Mihok stated, "it would [be] very difficult to justify any claims of superior performance without extremely compelling data." *Id.* at ¶ 73.

121.    Thereafter, in November 2018, Natera's then-Vice President of Marketing & Medical Education, Ramesh Hariharan, emailed Solomon Moshkevich, Natera's then-Senior Vice President, Products and Strategy, Anna Czene, Natera's then-Senior Director of Corporate and Marketing Communication, and Shephalie Lahri, Natera's then-Associate Director, Transplant Marketing and current Director, Marketing for Organ Transplantation, and stated, "I don't think we can claim superiority. Members of our stats team believe our better sensitivity was driven more by patient selection variables. I would rather say compelling results in recent research study." *Id.* at ¶ 74.

122.    In December 2018, while the Sigdel study was being reviewed for publication, Billings emailed Moshkevich and Minnie Sarwal, the principal investigator for and co-author of the Sigdel study, about the comparison of the Sigdel and Bloom studies, warning that "[t]he

reviewers are trying for apples to apples. Unfortunately, in these kinds of studies, that is not possible." *Id.* at ¶ 75. Moshkevich concurred, stating that "It's risky to claim that our product has superior clinical performance since our stats team found that the AUC comparison is not statistically significant." *Id.* at ¶ 76.

123.    On February 8, 2019, Natera's newly appointed CEO, Chapman, emailed Defendant Billings and identified "major risks" with the Sigdel study, including: (i) that it utilized a "single site study;" (ii) that it was a "retrospective study of the banked samples;" (iii) that "the major risk for the [Sigdel study] was the [principal investigator, responsible for preparing and carrying out the clinical trial protocol] with a reputation for massaging the data;" and (iv) "that the serum creatinine at 72 versus 54 in other studies is a major risk with the study." *Id.* at ¶ 77.

124.    Nevertheless, the next month, during Natera's March 12, 2019 4Q18 earnings call, Chapman told investors regarding the yet-to-be-commercialized test, that "[o]ur published clinical validation was 2x larger than other studies and the data showed a better overall area under the curve, superior detection of key cell [mediary] rejection and the ability to detect subclinical rejection where there are no other clinical signs."

125.    As the foregoing demonstrates, Defendants and other high-ranking Company officials internally recognized that the Sigdel study did not demonstrate that Prospera had superior clinical performance to competing commercial tests. However, the Company continued to represent to the public that Prospera had proven superior accuracy. This was because Prospera's alleged superiority was viewed by Defendants as the key to its commercial success. Indeed, Natera's marketing plan, as of June 19, 2019, included converting AlloSure users to Prospera users, as revealed by the testimony during the CareDx Trial of Shephalie Lahri, Natera's current Director of Marketing for Organ Transplant Unit for Natera. Dr. Gauthier similarly testified in the

CareDx Trial that, from the introduction of Prospera in 2019 through the middle of 2021, Natera targeted CareDx's customers to replace them with Natera's Prospera test through marketing materials that showed Natera's performance.

126.    Gauthier also admitted that he trained the sales and marketing teams to highlight comparisons between Prospera and AlloSure, and to state that Prospera was superior to AlloSure based on a comparison of the Sigdel and Bloom studies. He further testified that he trained the sales and marketing team how to compare the Prospera product to the AlloSure product, and that one of Natera's major marketing claims regarding Prospera was its superiority to AlloSure. He likewise trained Natera's sales and marketing team to explain to AlloSure customers that Prospera had greater overall sensitivity for any type of rejection, and better sensitivity that led to better positive predictive value and negative predictive value.[5]

127.    On March 14, 2022, a federal jury in the CareDx Trial returned a verdict based on evidence that Natera intentionally and willfully misled the public by using false advertisements to market Prospera as being more effective than AlloSure. All told, the jury awarded CareDx $44.9 million in monetary damages, including $23.7 million in punitive damages. The verdict further established the unfounded nature of Defendants' marketing claims about Prospera--claims which, to that point, had been highly successful in garnering kidney transplant test market share for Natera.

128.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents, including the Amended Complaint in the Securities Class Action (ECF No. 60) (the "Securities Complaint"), which contains detailed allegations based on interviews with two

---

[5] Positive predictive value is the likelihood that an individual with a positive test result truly has the condition in question. Negative predictive value is the likelihood that an individual with a negative test result is truly unaffected and/or does not have the particular condition in question.

former Natera employees (referred to herein as FE 1 and FE 2) who provided information

supporting the allegations in that case. These former employees provided information on a

confidential basis and were described in the Amended Complaint with sufficient detail to establish

their reliability and personal knowledge. Among other things, the accounts of these former

employees corroborate the Prospera Misconduct. According to the Amended Complaint:

> Statements from FE-1 corroborate Dr. Gauthier's testimony. FE-1 served as a nephrology sales representative from 1Q20 to 4Q20 in Natera's Organ Health business. In this role, FE-1 handled Prospera sales for several states in a region of the Southern United States. FE- 1 reported to a regional manager, who reported to Steve Wallace, Vice President of Organ Transplant. Wallace reported to Senior Vice President of Sales Phillip Grinnell, who reported to Chapman.
>
> FE-1 attended a week of training focused on Prospera when FE-1 joined Natera. FE-1 stated that all of the roughly 50 people hired as part of the Prospera sales force attended that training. FE-1 also recalled that Natera trained them to tell doctors that Prospera was superior to AlloSure based on comparisons of the Sigdel and Bloom studies, and to focus on certain favorable data points. Specifically, FE-1 recalled that Natera trained FE-1 and FE-1's colleagues to push the narrative that CareDx "essentially cherry picked" data and that Natera did not. FE-1 also explained that during this week-long training regarding Prospera, there was a significant emphasis placed on making comparisons of Prospera's PPV and NPV against AlloSure's, using the Sigdel and Bloom studies' data.
>
> FE-1 further stated that Prospera sales representatives could leave the Sigdel study with doctors, and that Natera had several "I-pagers" that sales representatives could leave behind. FE-1 explained that when FE-1 joined Natera, one of the "I-pagers" included aggressive language that CareOx was effectively lying about AlloSure, and comparing Prospera' sand AlloSure's NPV. Another "I-pager," according to FE-I, contained a bar chart graphic comparing Prospera's NPV against AlloSure's NPV, based on the Sigdel and Bloom studies.
>
> FE-I then explained that Natera held weekly or bi-weekly nationwide conference calls that all organ transplant sales representatives and managers attended. FE- I recalled that Steve Wallace, one of two Natera Vice Presidents of Organ Transplant, attended these meetings. FE-I explained that in June or July 2020, FE-I attended one of these meetings, during which the sales representatives were told they could no longer use the two "I-pagers" or present the Sigdel study to doctors or leave it with them. FE- I did not recall any explanation given as to why those changes were made.

FE-2, a Director in marketing for Natera from the fall of 2020 through the end of the Class Period, stated that Kate Stabrawa, Head of Communications and PR for Natera, and a direct advisor to Chapman, repeatedly told Chapman not to make public statements comparing Natera's products to CareDx's. Specifically, Stabrawa told FE-2 that she was frustrated Chapman was not listening to her on how to approach media or how to address competition or products, and often complained about Chapman saying at town hall meetings and other forums that Natera was better than CareDx. According to FE-2, Stabrawa advised Chapman directly to stop saying that Natera was better than CareDx, but he continued to do it.

Securities Class Action, Amended Complaint at ¶¶ 82-86.

129.    As news regarding the Panorama fraud hit the market, on March 14, 2022, a federal jury in the CareDx Trial found that Natera had intentionally and willfully misled the public by utilizing false advertisements to market Prospera in violation of the federal Lanham Act, the Delaware Deceptive Trade Practices Act, and Delaware common law.

130.    In the lawsuit, CareDx alleged that Natera relied on results from its flawed Sigdel study to make misleading statements in 2018 and 2019 about Prospera, including that Prospera was more effective than AlloSure. Moreover, in the process of litigating the action, Natera consistently denied that it made false or misleading statements about Prospera as compared to AlloSure.

131.    Ultimately, the jury found that Natera was liable for false advertising when it claimed, among other things, that Prospera was "[m]ore sensitive and specific than current assessment tools across all types of rejection," led to a "[l]ower risk of missing active rejection," and had exhibited "[s]tronger test performance demonstrated with unique clinical capabilities." The jury awarded CareDx $44.9 million in monetary damages, including $23.7 million in punitive damages.

132.    On this news, Natera common stock fell as much as $8.81 per share, or approximately 22.5%, from an intra-day high of $39.13 per share on March 14, 2022, to close at

$30.32 per share on March 15, 2022.

**_Materially False and Misleading Proxy Statements_**

133.    On April 16, 2020, Defendants issued the 2020 Proxy, wherein Defendants solicited shareholder votes in favor of five proposals, including the re-election of Defendant R. Chapman, and non-binding approval of the compensation paid to Natera's named executive officers.

134.    On April 13, 2021, Defendants issued the 2021 Proxy, wherein Defendants solicited shareholder votes in favor of three proposals, including the re-election of Defendants S. Chapman, Botha, and Rabinowitz and non-binding approval of the compensation paid to Natera's named executive officers.

135.    The 2020 Proxy and the 2021 Proxy state that Natera has adopted a Code of Business Conduct & Ethics that applies to all Defendants.

136.    The 2020 Proxy and the 2021 Proxy also note that the Audit Committee is responsible for _inter alia_ reviewing "disclosure controls and processes, and the adequacy and effectiveness of our internal controls."

137.    The 2020 Proxy and the 2021 Proxy omitted to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to the Prospera Misconduct and the Panorama Misconduct.

138.    The 2020 Proxy and the 2021 Proxy also was false and misleading because it failed to disclose the following: (1) contrary to the 2020 Proxy and the 2021 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate insider trading laws, and thus the

Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation.

139.    The false and misleading elements of the 2020 Proxy and the 2021 Proxy statements were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors and the approval of executive compensation.

### Insider Sales

140.    From February 26, 2020, through March 14, 2022, the price of Natera common stock skyrocketed as a result of Defendants' misstatements and omissions.

141.    S. Chapman, Brophy, and Rabinowitz took advantage of Natera's artificially inflated stock price to collectively sell over $137 million worth of their Natera common stock holdings while in possession of the material nonpublic information discussed herein.

142.    Defendants Sheena and Rosenman also made illegal insider sales at artificially inflated prices while in possession of material non-public company information.

143.    In particular, S. Chapman disposed of 846,645 shares of Natera common stock worth $73,803,491.84, Brophy disposed of 267,581 shares of Natera common stock worth $25,218,695.89, and Rabinowitz disposed of 508,356 shares of Natera common stock worth $38,256,649.04.

### The Securities Class Action

144.    On February 17, 2022, as a further result of the foregoing Prospera Misconduct and Panorama Misconduct, a class of Natera investors filed the Securities Class Action against the Securities Action Defendants (the Company and Defendants S. Chapman, Rabinowitz, Brophy,

Billings, and Hariharan).

145.    On September 11, 2023, the court in the Securities Class Action denied the

Securities Action Defendants' motion to dismiss under the heightened pleading standards of the

PSLRA.  Securities Class Action, ECF. No. 104 (the "Motion to Dismiss Decision").

146.    The Court, in the Motion to Dismiss Decision, found:

> Plaintiffs adequately allege that Defendants' repeated statements that
> Panorama was a key source of Natera's revenues ("[t]he increase in total
> revenues was driven primarily by sales of Natera's Panorama and Horizon
> tests"), made while concealing that Panorama revenues were inflated by
> deceptive practices—such as the inappropriate submission of prior
> authorizations by MGML—rendered those statements false or misleading.
> The same is true for Defendants' statements regarding microdeletions.

Motion to Dismiss Decision at 24.

147.    The Motion to Dismiss Decision continued,

> As Plaintiffs note, Defendants' assertion that the "misrepresentations and
> omissions about [] Natera's deceptive billing practices were not sufficiently
> material to render investment in the July 2021 SPO risky, or that the
> undisclosed risk could seriously affect its present or future business" is
> "belied by the significant market reaction[] following disclosure of the"
> Hindenburg Report.  Plaintiffs have thus stated an actionable "omission."
> (internal citations omitted).

*Id.* at 27-28.

148.    The Court also found "Plaintiffs have supported a cogent inference of scienter…as

to Chapman, Brophy, and Rabinowitz." *Id.* at 25.

149.    The Securities Class Action has exposed the Company to massive class-wide

liability.

150.    While the court in the Securities Class Action granted the defendants' motion to

dismiss as to the Prospera claims – finding that "as currently pled, the Prospera statements are not

actionable" – it did so without prejudice and permitted the plaintiffs to file an amended complaint.

*Id.* at 31-32.

*__Harm to Natera__*

151.    From at least February 26, 2020, through March 14, 2022, the Individual Defendants engaged in the Panorama Misconduct and the Prospera Misconduct and intentionally or recklessly made and/or permitted the dissemination of materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.

152.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action and the Consumer Class Action, exposing the Company to millions of dollars in potential class-wide damages, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.  The Company must also be made whole for Defendants' illegal insider sales.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

153.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

154.    Natera is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

155.    Plaintiff is a current shareholder of Natera and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

156.    At the time this action was commenced, the ten-member Board was comprised of Defendants Rabinowitz, S. Chapman, Baynes, Botha, R. Chapman, Healy, Marcus, Rosenman, Sheena (collectively, the "Director Defendants") and non-party Ruth E. Williams-Brinkley ("Williams-Brinkley") (collectively with the Director Defendants, the "Demand Board"). Accordingly, Plaintiff is only required to show that five members of the Demand Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  As detailed herein, all ten members of the Demand Board, and if not, at least the nine Director Defendants, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because the Director Defendants face a substantial likelihood of liability, and so demand on the Current Board to institute this action is not necessary because such a demand would have been a futile act.

157.    As an initial matter, the Company's 2023 proxy statement, filed with the SEC April 20, 2023 (the "2023 Proxy"), concedes that Director Defendants Rabinowitz, S. Chapman, and Sheena are not independent. See 2023 Proxy at 21 ("Our board of directors has determined that…Botha and Rosenman, [ ] Baynes, Chapman, Healy and Marcus, and [ ] Williams-Brinkley… is "independent"…").

158.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Natera, the Director Defendants knew, or should have known, the material facts surrounding the trials, challenges, and promotion of the Company's most important products, Prospera and Panorama.

159.    The Director Defendants, together and individually, violated and breached their

fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein – including the Panorama Misconduct and the Prospera Misconduct – and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the Company to violate the law, authorized and/or permitted the issuance of various false and misleading statements, including the 2020 Proxy and 2021 Proxy, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

160.    The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

161.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Natera, the Director Defendants knew, or should have known, the material facts surrounding Natera's most important products, Prospera and Panorama.

162.    The Director Defendants had actual knowledge of nonpublic information that contradicted their public statements about Panorama, including that revenue was not the result of organically growing demand but, in fact, fueled by deceptive and improper business practices within Natera. The Director Defendants also had actual knowledge of nonpublic information that contradicted their public statements about Prospera's performance as compared to AlloSure. Those

communications demonstrate that, internally, these Defendants were aware from day one that public statements claiming Prospera's superiority over AlloSure based on that study data were false, or at best misleading, because: (i) Natera did not have a head-to-head comparison data against the Bloom Study; and (ii) Prospera's performance data was not significantly better than, or was roughly equal to, AlloSure's. Defendants repeatedly spoke about Prospera's performance as compared to AlloSure, and the relevant underlying data and studies, and about Panorama, including how it drove the Company's revenues. These repeated statements demonstrate their knowledge of and access to information about those topics or, at the very least, that they were reckless in failing to investigate the very issues on which they spoke publicly.

163.    Defendants' fraud concerned Natera's sole business segment, which it has described as the development and commercialization of molecular testing services. Both Panorama and Prospera are molecular tests. Indeed, Panorama was one of Natera's most important revenue drivers. In addition, Prospera was Natera's core first offering in one of the Company's three business segments. Defendants also repeatedly highlighted Prospera as a key piece of the future growth of the Company.

164.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

165.    As a result of *inter alia* the Panorama Misconduct and the Prospera Misconduct, Director Defendants S. Chapman and Rabinowitz, among other Individual Defendants, have been named as defendants and face a substantial likelihood of liability in the Securities Class Action.

166.    Defendants S. Chapman, Sheena, Rosenman and Rabinowitz also disposed of

millions worth of Natera common stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein.   As such, they face a substantial likelihood of liability and demand upon them is futile.

167.    S. Chapman disposed of 846,645 shares of Natera common stock at an average price of $91.76, worth over $73,803,491.84.  Both the amount and timing of S. Chapman's trades were unusual and suspicious. For example, S. Chapman's sold approximately 93.90% of his total reported Natera common stock holdings at relevant times. S. Chapman's trades were also suspicious because they were dramatically out of line with his prior trading history. In particular, during a "Control Period" from January 3, 2018, to February 25, 2020, S. Chapman only sold 512,370 shares of Natera stock worth approximately $14,238,373.80. During the Control Period, S. Chapman disposed of significantly less stock than during the Class Period, at an average share price of $26.83. Comparatively, while Company stock was inflated due to the false and misleading statements detailed herein, S. Chapman sold an average of approximately 423,322.5 shares per year, for average yearly sales worth $36,901,762.4-more than two and a half times higher than the value of his average yearly sales during the Control Period.  Rabinowitz disposed of 508,356 shares of Natera common stock at an average price of $79.26, worth over $38,256,649.04. Both the amount and timing of Rabinowitz's trades were highly unusual and suspicious. In comparison, during the Control Period, Rabinowitz disposed of his common stock at an average share price of $27.55.  Director Defendants Sheena and Rosenman also made illegal insider sales at artificially inflated prices while in possession of material non-public company information, including Sheena on December 10, 23, and 28, 2021, January 24, 2022, and March 10, 2022, and Rosenman on November 1 and 8, 2021.

168.    The Director Defendants also had motive to engage in the misleading marketing

and deceptive business practices that increased Natera's revenues, as the Company's short-term cash incentive plan provided annual cash bonuses to each of them. Natera's performance against annual revenue targets had a relative weighting of 55% in determining S. Chapman's and Rabinowitz's annual cash bonuses. For example, in 2020, against a target metric of $352 million in revenues, Natera achieved $391 million in revenues. This performance had a 55% weight in determining S. Chapman's $296,884 bonus and Rabinowitz's $180,263 bonus for 2020. Similarly, in 2021, against a target of $549.2 million, Natera achieved $625.5 million in revenues. This performance had a 55% weight in determining S. Chapman's $391,153 bonus and Rabinowitz's $168,210 bonus for 2021.

169.    S. Chapman also had motive to engage in the deceptive billing practices that contributed to Natera's revenues because a significant portion of his total compensation in 2020 and 2021 hinged on Natera's ability to hit certain annual revenue targets. In 2020, 73% (roughly $5.9 million) of Chapman's total compensation (roughly $8 million) was the result of receiving performance-based restricted stock units ("PSUs") and options "tied to market valuation and revenue hurdles." Similarly, in 2021, 82% (roughly $18.6 million) of S. Chapman's total compensation (roughly $22.7 million) was the result of receiving PSUs and options "tied to market valuation and revenue hurdles."

170.    The entire Demand Board is subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the members of the Demand Board to also adhere to Natera's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly allowed the Company to violate the law.  The entire Demand Board violated the Code of Conduct, including by refusing to take action to address the misconduct alleged herein. As such,

the entire Demand Board faces a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

171.    The Audit Committee is and was responsible for, *inter alia*, overseeing "the integrity of the financial statements of the Company" and "compliance by the Company with legal and regulatory requirements."  Director Defendants Rosenman (Chair), R. Chapman, Healy and Marcus, as members of the Audit Committee breached their fiduciary duties by declining to act in the face of repeated red flags that the Company was deficient in meeting its compliance and reporting obligations. These Director Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

172.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. Director Defendants Baynes, Botha, Healy and Marcus served the Board that appointed S. Chapman as CEO of the Company. Accordingly, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action due to their close relationship with, and indebtedness to, the Director Defendants named herein.

173.    Furthermore, demand, in this case, is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. The Director Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand for the Director

Defendants would be futile.

174. Significantly, no member of the Demand Board has taken any remedial action to redress the conduct alleged herein.

175. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Natera. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Natera, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

176. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Natera to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

177. Accordingly, a pre-suit demand on the Demand Board is futile and excused.

## COUNT I
### Against the Director Defendants for Violations of § 14(a)
### of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

178.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.    Under the direction and watch of the Director Defendants, 2020 Proxy and 2021 Proxy failed to disclose, *inter alia*: (1) contrary to their descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation.

182.    The 2020 Proxy and 2021 Proxy further failed to disclose that the Company was engaged in the Panorama Misconduct and the Prospera Misconduct, issuing false and misleading statements in violation of securities laws, and had failed to establish or maintain adequate internal controls. As a result, the 2020 Proxy and 2021 Proxy were materially false and misleading.

183.    In the exercise of reasonable care, these defendants should have known that the statements contained in the 2020 Proxy and 2021 Proxy statements were materially false and misleading.

184.    The misrepresentations and omissions in the 2020 Proxy and 2021 Proxys were material to Company stockholders in voting on the proposals made therein. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the 2020 Proxy and 2021 Proxy, including but not limited to the reelection of certain Director Defendants and the approval, on an advisory basis, of the compensation of the Company's executives.

185.    The false and misleading elements of the 2020 Proxy and 2021 Proxy led to, among other things, the election of the Defendants R. Chapman, S. Chapman, Botha, Healy, and Rabinowitz, which allowed them to continue to breach their fiduciary duties to Natera.

186.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2020 Proxy and 2021 Proxy.

187.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II
### Against the Individual Defendants for Breach of Fiduciary Duty (*Caremark*)

188.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189.    The Individual Defendants owed the Company fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

190.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

191.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

192.    Defendants consciously breached their fiduciary duties by failing to exercise their oversight responsibilities and failing in good faith to implement any reporting or information system or controls to address central compliance risks. Defendants consciously breached their fiduciary duties by failing to implement sufficient controls in good faith to oversee their core products and by engaging in the Prospera Misconduct and Panorama Misconduct.

193.    Defendants failed to implement and monitor internal reporting policies and systems to ensure that sufficient indicia regarding whether the Company was (or was not) complying with applicable laws and regulations.

194.    Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to

make a good faith effort to correct the problems or prevent their recurrence. Defendants were put on notice that Natera was violating the law or was otherwise headed for a corporate trauma, but did nothing in response and/or became aware of risks that the corporation was violating the law or otherwise heading toward a corporate trauma, yet did nothing.

195.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

196.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## <u>COUNT III</u>
### Against the Individual Defendants for Breach of Fiduciary Duty (*Brophy*)

197.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.    From February 26, 2020, through March 14, 2022, Defendants S. Chapman, Sheena, Rosenman, Rabinowitz and Brophy held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding their duty to refrain from trading in Natera's common stock under the circumstances, these Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects. These sales were not part of any regular pattern of sales for these Defendants and were

suspicious in terms of timing and amount.

199.    The information described herein – including the undisclosed Panorama Misconduct and Prospera Misconduct – was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendants S. Chapman, Sheena, Rosenman, Rabinowitz, and Brophy misappropriated to their own benefit when they sold Natera stock.  At the time of their stock sales, these Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  The Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

200.    As a result of their misconduct, Defendants S. Chapman, Sheena, Rosenman, Rabinowitz and Brophy are liable to the Company.

201.    Plaintiff, on behalf of Natera, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

202.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

203.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

conduct complained of herein.

204.    Plaintiff on behalf of Natera has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Unjust Enrichment

205.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

206.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Natera.

207.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Natera that was tied to the performance or artificially inflated valuation of Natera, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

208.    Plaintiff, as a shareholder and a representative of Natera, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

209.    Plaintiff on behalf of Natera has no adequate remedy at law.

## COUNT VI
### Against the Individual Defendants for Waste of Corporate Assets

210.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

211.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Natera's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing

the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

212.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

213.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf Natera has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: October 17, 2023,                    Respectfully submitted,

                                            **COCHRAN LAW PLLC**

                                            By: _/s/ Stuart L. Cochran_
                                                  Stuart L. Cochran
                                                  Texas Bar No.: 24027936
                                                  8140 Walnut Hill Ln, Suite 250
                                                  Dallas, TX 75231
                                                  Telephone: (469) 333-3405
                                                  Facsimile: (469) 333-3406
                                                  Email: stuart@scochranlaw.com

                                                  *Attorneys for Plaintiff*

*Of Counsel:*

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

## <u>VERIFICATION</u>

I, Charlotte Morariu am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 10/13/2023 .

Charlotte Morariu